Filed 6/30/15  In re Anthony E. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANTHONY E., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY E.,<br><br>    Defendant and Appellant. | A142693<br><br>(San Francisco City and County Super. Ct. No. JW13-6219) |

Appellant Anthony E. appeals after the juvenile court sustained one count of robbery in a juvenile wardship proceeding.  On appeal, appellant contends (1) there is insufficient evidence to support the juvenile court's finding that he aided and abetted a robbery, and (2) a probation condition prohibiting him from associating with people "known to have any kind of weapons" is unconstitutionally vague and overbroad.  We conclude the challenged probation condition should be modified to prohibit appellant from associating with anyone "known to possess any dangerous or deadly weapons." We shall otherwise affirm the juvenile court's orders.

**PROCEDURAL BACKGROUND**

On May 29, 2014, a juvenile wardship petition was filed, pursuant to Welfare and Institutions Code section 602, subdivision (a), alleging that appellant, then age 17, had

1

committed robbery (Pen. Code, §§ 211/212.5—count 1)[1] and had concealed stolen property (§ 496, subd. (a)—count 2). As to count 1, it was further alleged that a principal had been armed with a firearm during the commission of the offense. (§ 12022, subd. (a)(1).)

On June 30, 2014, following a contested jurisdictional hearing, the juvenile court sustained count 1, found true the enhancement allegation, and dismissed count 2.

At the July 15, 2014, dispositional hearing, the court ordered appellant removed from his home and committed to the custody of the probation department for out-of-home, out-of-state placement, with a maximum period of confinement of seven years, eight months.

On August 8, 2014, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

Albert Cheng testified that, about 1:16 p.m. on May 27, 2014, he was shooting a basketball at Louis Sutter playground in McLaren Park in San Francisco when six or seven boys approached him. One of the boys asked if he was playing basketball. Thinking they might want to play basketball with him, he said that he was, but that he had to leave in 15 minutes.

One of the boys then said, "[W]hat you got." Cheng felt "alarmed" by this question. When Cheng said he did not have anything, three of the boys approached and surrounded him while the others stood at the edge of the basketball court. Cheng described the boy who asked the question as wearing a Northface rain jacket with a "hoodie" wrapped around his neck and covering his face.[2] His skin tone was a darker brown than Cheng's and he had a small head relative to his body. This boy was standing

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] It was defense counsel who first used the term, "hoodie" during his cross-examination of Cheng, and later during his cross-examination of Officer Giles, one of the officers who subsequently detained appellant. (See text, *post*.) Counsel seemingly was attempting to describe a hood that was attached to the Northface rain jacket. What this word actually meant to the witnesses is, however, ambiguous since the term "hoodie" most often describes a sweatshirt with an attached hood.

between the other two boys; he stood "really close," about an inch away from Cheng. The boy to the left of the boy in the Northface jacket was holding a silver gun at hip level, as though trying to conceal it. He also stood about an inch away from Cheng. He was kind of chubby and wore a gray sweater. Cheng felt "[a] little startled" when he saw the gun because he had never seen one before. The third boy was standing about two to three inches away from Cheng. He was skinny.

The boy in the Northface jacket patted Cheng's pockets and, when he felt Cheng's phone, removed it from the pocket. Cheng did not feel like he could stop the boy because he was holding a basketball and there were six people present. The boy with the gun held it at his waist, but pointed at Cheng, who felt a bit scared during the interaction. After taking Cheng's phone, the three boys walked away and started giggling. They then ran away with the other boys who had been standing at the sidelines of the court. Cheng eventually lost sight of them.

About five minutes later, Cheng was walking home when he saw the same group of boys walking up a nearby street. He could tell it was the same group because he remembered their clothing, which was mostly black. He believed they also recognized him because one of them, a boy in brown pants, was waving his phone at him. About 45 minutes after the incident at the basketball court, Cheng met with police, who asked him to look at some suspects. He did not identify anyone because he "wanted to make sure . . . to get the right people . . . I [didn't] want to send innocent people to jail." At the hearing, Cheng testified that he did not recognize anyone in the courtroom.

San Francisco Police Officer Christopher Giles assisted in the robbery investigation that day and detained six individuals, one of whom was appellant. Appellant was wearing a black Northface jacket without a hoodie. Another individual who was detained, "P.," had a semiautomatic gun in his possession, inside his pants leg by his right ankle. P. was wearing light pants, Timberland shoes, and a striped shirt. Another of the suspects was Juan D., who was wearing a black Northface jacket with a hoodie and light yellow pants.

3

San Francisco Police Officer Jessie Ortiz, who also assisted in the robbery investigation, testified that officers detained the group of six individuals about 1:46 p.m. (within 30 minutes of the robbery), because two of them matched a description given by dispatch, which was that one of the robbery suspects was wearing a black Northface jacket; another was wearing gray clothing and was heavy set. The six boys had been standing close together, facing each other, and talking when the officers approached. When the officers asked if anyone had a gun, they all said no, but Officer Giles recovered a gun from P., who was wearing tight pants and a shirt. Ortiz then asked who had the phone, and appellant, who was wearing a Northface jacket and black pants, said he had it. Appellant then pulled Cheng's phone out of his right rear pocket and gave it to Ortiz. Another boy who was detained, Ryan, was "the chubby one." In addition to appellant, another of the six boys—Juan D.—was wearing a Northface jacket, with khaki pants.

## DISCUSSION

### I. *Sufficiency of the Evidence to Support the Robbery Conviction*

Appellant contends there is insufficient evidence to support the juvenile court's finding that he aided and abetted a robbery.

### A. *Trial Court Background*

At the conclusion of the jurisdictional hearing, defense counsel argued that appellant was not the person who took the cell phone during the robbery, but, instead, was "[t]he third person who's standing by who didn't touch Mr. Cheng, didn't take his [cell] phone . . . . [¶] . . . [¶] He was there, stood there, and he walked away." Based on these asserted facts, counsel asked the court to find that appellant had violated section 182, conspiracy to commit a robbery against Cheng.

In response to this argument, the prosecutor stated: "Even if we went to [defense counsel's] alternative argument that Anthony is not the one who did the pat-down of the victim, he is still, according to [defense counsel], [two] inches away from the victim, standing there as the muscle while the other individual is holding a gun to the victim." Therefore, according to the prosecutor, appellant would still be guilty of aiding and abetting a robbery.

4

The court then made the following findings: "Well, first of all, I certainly do have a robbery here. [¶] We had Mr. Cheng innocently playing basketball at McLaren Park, then he's accosted by what he estimated about six or seven juveniles; they're all together. The person in the Northface jacket says, 'what you got.' He's [got] darker brown skin than Mr. Cheng. [¶] The other young men are of color also . . . except for one of them, Mr. S. . . . [¶] . . . [¶] But interestingly, the individual in petitioner's 7 [Juan D., who was wearing a Northface jacket with a hoodie] doesn't have a head smaller than his body. The way I see it, there's nothing smaller about his head. It does look smaller specially [*sic*] now that his hair is filled out.

"What's uncontested is that Anthony was wearing a Northface jacket, and that the young man was robbed, he was startled, he was alarmed, someone had a gun at him. [¶] There were three young men inches from him.

"And the argument is a valid one that two of them were at least the muscle or the enforcer of helping the guy with the gun. . . . [¶] . . . [¶] There was a guy with a gun, and he was certainly robbed. [¶] The guy with the Northface jacket patted him down. His phone was taken from him. Then all three walked away giggling, which is like to add insult to injury. . . .

"And so whether Anthony was the enforcer taking the phone, or whether he was just standing there helping inches away, being the muscle so to speak, [the prosecutor's] words which are valid, all three of them were aiding and abetting a robbery with a gun, and then laughing. [¶] Every one then runs away as a group. They're helping each other. They're really close together as they're running. . . . [¶] . . . [¶]

"Now, whether the victim was mistaken about the hoodie of the Northface jacket or not, what's clear is that Anthony was aiding and abetting a robbery. [¶] . . . [¶]

"Even if Anthony was the third guy, he's there, inches away from the victim staring at the guy, his buddy with the gun. So either he's the one who is doing the pat-down so to speak, or he's there helping the guy with the pat-down and the other guy with the gun standing there, encircling the victim, and basically some ways falsely imprisoning the victim so that the robbery can take place. [¶] So really, according to the

5

case law, he is aiding the perpetrator either by taking the phone himself or aiding the other guy to take the phone, either way. [¶] . . . [¶]

"And really to be honest, description-wise of Anthony, and they're all facing each other, all six of these people when the cops come up on them. They were all then turning and looking at the cops and Anthony has the phone. [¶] And that[] circumstantially makes sense that he's the one who pulled it out of the pocket of the victim to begin with. It all circumstantially fits.

"And I am convinced beyond a reasonable doubt that Anthony participated in an actual robbery . . . ."

## B. *Legal Analysis*

In assessing the sufficiency of the evidence, "[o]ur review is governed by the same principles applicable to adult criminal appeals. [Citation.] Our function is 'to determine whether the record contains any substantial evidence tending to support the finding of the trier of fact, and in considering this question we must view this evidence in the light most favorable to the finding.' [Citation.]" (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1328.) This standard of review is applicable to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) " 'Although it is the duty of the [trier of fact] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [trier of fact], not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.]" (*Ibid.*)

Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

Section 31 provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act

constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." Our Supreme Court has explained that " '[a] person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Delgado* (2013) 56 Cal.4th 480, 486.)

Here, appellant does not argue that there was insufficient evidence that his purported acts—whether standing beside the person with the gun and patting down Albert Cheng's pockets, or merely standing two or three inches from Cheng while another person patted down Cheng—constituted aiding and abetting a robbery pursuant to section 211 and 31. Rather, he claims the evidence was insufficient to show that he was one of the three boys who surrounded Cheng or even that he was present at the scene during the robbery. According to appellant, another boy, Juan D., who was wearing a black Northface rain jacket with a hoodie and brown pants, fit Cheng's description of the suspect who took his phone, while appellant, who wore a black fleece-type Northface jacket and black pants, did not. He also points out that Cheng described the third boy who stood with the other two boys as "skinny"; Anthony is not skinny and another boy detained with the group—P.—was skinny. Appellant also notes that Cheng was unable to identify any of the suspects either shortly after the incident or at the jurisdictional hearing. He asserts that the evidence shows only that he had the phone in his possession when he was later detained by police.

Respondent counters that the evidence was sufficient to support the juvenile court's finding that appellant was the suspect who took Cheng's phone, particularly given that Cheng's fear and the number of boys present could have caused him to be confused about which boy was wearing which Northface jacket. Respondent further maintains, in light of defense counsel's concession at the jurisdictional hearing that appellant was the third boy during the robbery, that the juvenile court was justified in finding that appellant was one of the three boys who stood in Cheng's immediate presence during the robbery.

7

Respondent also argues that, aside from Cheng's likely initial confusion, it is possible that the boys could have switched their clothing after the robbery.

Viewing the evidence in the light most favorable to the dispositional order, we conclude substantial evidence supports the juvenile court's finding that appellant aided and abetted the robbery of Cheng. (See *In re Muhammed C.*, *supra*, 95 Cal.App.4th at p. 1329.) Moreover, because we believe there was substantial evidence that appellant was the suspect who took Cheng's phone, we need not address whether the court's secondary finding that he could also have been the third suspect was reasonable or whether the third suspect could be held liable as an aider and abettor to the robbery. Nor do we rely on defense counsel's concession that appellant was one of the three people in the victim's immediate presence at the time of the robbery. (Cf. *People v. Leonard* (2014) 228 Cal.App.4th 465, 500 [finding unpersuasive defendant's attempt to characterize prosecutor's statement as binding judicial admission, given that such statements are not evidence and are not binding on jury or court].)

The record reflects that Cheng described the suspect who patted him down and took his phone as wearing a black Northface rain jacket with a "hoodie" wrapped around his neck and covering his face,[3] with a skin tone that was a darker brown than Cheng's, and a small head. Cheng also testified that, when he passed the group of boys five minutes later, a boy in brown pants waved his phone at him. The photographs taken at the time the boys were detained show that appellant was wearing a black Northface jacket of indeterminate fabric and black pants. The photographs of the other boy who was wearing a Northface jacket—Juan D.— show that he had on what appears to be a dark blue Northface rain jacket with an attached hood and very light beige or yellow pants. He was also wearing a distinctive white cap with a red brim, which had illustrations and wording on it. Finally, appellant had the phone in his pocket when detained by police.

---

[3] Although Cheng did not testify at trial that the Northface jacket was black, Officer Ortiz testified that the dispatcher had described one of the robbery suspects as wearing a black Northface jacket.

8

The juvenile court made factual findings that appellant was wearing a Northface jacket, that his skin is darker brown than Cheng's, and that the other boy who was wearing a Northface jacket did not have a small head. The court concluded that, in light of Cheng's description of the suspect who took his phone and the fact that appellant had the phone in his possession when the group was detained by the police, it "circumstantially makes sense that he's the one who pulled it out of the pocket of the victim to begin with. It all circumstantially fits." We agree.

While appellant's Northface jacket did not have a hood, that is not determinative, given Cheng's likely—and understandable—confusion due to the number of boys at the scene and his alarmed state of mind during the robbery. Moreover, it is notable that, in the photograph in the record, Juan D.'s Northface jacket looks dark blue, not black. Juan D. was also wearing a distinctive cap when detained, which Cheng did not mention when describing the boy who took his phone. As to Cheng's description of the boy who later waved the phone at him as wearing brown pants, appellant's black pants were as likely to appear brown as were Juan D.'s pants, which were very light in color. Finally, that Cheng was unable to identify appellant or any of the other boys 45 minutes after the robbery or identify appellant at the jurisdictional hearing is not surprising, given that the boy who took the phone hid his face with his jacket, there were at least six boys present at the scene, and Cheng felt alarm and fear during the robbery.

In conclusion, substantial evidence supports the juvenile court's finding that appellant aided and abetted the robbery of Albert Cheng. (See *In re Muhammed C.*, *supra*, 95 Cal.App.4th at p. 1329.) Although there were some discrepancies between the victim's description and appellant's attire, the circumstances nonetheless " ' " 'reasonably justif[ied]' " ' " the juvenile court's findings. (*People v. Stanley*, *supra*, 10 Cal.4th at pp. 792-793.) Hence, even if we believed that " ' " 'the circumstances might also reasonably be reconciled with a contrary finding,' " ' " reversal of the judgment would not be warranted. (*Ibid.*)

9

## II. *Weapons-Related Probation Condition*

Appellant contends the probation condition regarding associating with people known to have "any kind of weapons" is unconstitutionally vague and overbroad.[4]

Although appellant did not object to this condition of probation in the juvenile court, a challenge to a probation condition is not forfeited if "the error is one that is 'capable of correction without reference to the particular sentencing record developed in the trial court.' [Citation.] In [this] circumstance, such a claim may 'present a pure question of law' properly addressed on appeal, even if there was no objection below. [Citation.]" (*In re Luis F.* (2009) 177 Cal.App.4th 176, 181, quoting *In re Sheena K.* (2007) 40 Cal.4th 875, 890.) Because appellant's challenge presents a pure question of law, we will address it now.

"A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. [Citation.] A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad. [Citation.]" (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 890; accord, *In re Victor L.* (2010) 182 Cal.App.4th 902, 913 [due process "requires that the probationer be informed *in advance* whether his conduct comports with or violates a condition of probation"].)

In this case, the challenged probation condition provides: "Minor not to associate with persons known to have any kind of weapons." According to appellant, this condition does not provide him with adequate notice of the prohibited conduct because, "while the word 'weapon' obviously applies to items such as guns, knives, dirks and blackjacks that are specifically designed as weapons, it has also been held to apply to many seemingly innocuous items," such as pencils, pillows, and cars. Appellant therefore requests that we further define the word "weapon" in some way, such as " 'an

---

[4] Respondent did not address this issue in its briefing.

10

object designed for use as a weapon.' [Citation.]" We agree that the challenged condition is so vague that it does not provide appellant with sufficient notice of what is prohibited. (See *In re Victor L.*, *supra*, 182 Cal.App.4th at p. 913.)

In *In re R.P.* (2009) 176 Cal.App.4th 562, 570, the appellate court concluded a probation condition prohibiting the minor from possessing any "dangerous or deadly weapon" was not unconstitutionally vague because the phrase " 'dangerous or deadly weapon' has a plain commonsense meaning sufficient to put [the minor] on notice of the conduct prohibited by the probation condition at issue." (Accord, *People v. Moore* (2012) 211 Cal.App.4th 1179, 1186 (*Moore*) ["dangerous or deadly weapon" refers to "items specifically designed as weapons, and other items not specifically designed as weapons that [an individual] intended to use to inflict, or threaten to inflict, great bodily injury or death"].)

Here, we believe that modifying the challenged condition of probation to prohibit appellant's association with "persons known to be in possession of any dangerous or deadly weapons" is appropriate because it will make clear to appellant exactly what is expected of him. (See *Moore*, *supra*, 211 Cal.App.4th at p. 1186; *In re R.P.*, *supra*, 176 Cal.App.4th at p. 570.)[5] We will therefore remand this matter to the juvenile court with directions to so modify the challenged condition.

---

[5] This probation condition, as described in the court's minute order and as challenged by appellant, is stated slightly differently in the court's oral pronouncement in that, at the dispositional hearing, the court stated, inter alia, "you are not to be around people who have weapons in their possession . . . ." To avoid any confusion, to the extent the oral pronouncement might be deemed to control over the slightly different language in the minute order (see, e.g., *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2), we note that the condition in question must also contain a knowledge requirement, as set forth in the court's minute order and in the text, *ante.* (See *In re Victor L.*, *supra*, 182 Cal.App.4th at pp. 912-913 & fn. 6 [modifying probation condition to prohibit minor's presence "only where he knows weapons exist"]; but see *Moore*, *supra*, 211 Cal.App.4th at pp. 1186 [stating inadvertent possession of weapon could not be considered willful probation violation]; *People v. Patel* (2011) 196 Cal.App.4th 956, 960-961 [announcing intention to "construe every probation condition proscribing a probationer's presence,

## DISPOSITION

The matter is remanded to the juvenile court with directions to modify the minute order setting forth the challenged probation condition to read: "The minor shall not associate with persons known to be in possession of any dangerous or deadly weapons." As so modified, the juvenile court's orders are affirmed.

_____
Kline, P.J.

We concur:

_____
Stewart, J.

_____
Miller, J.

---

possession, association, or similar action to require the action be undertaken knowingly"].)